**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
HELENA DIVISION**

ANTONIO MORAN,

Plaintiff,

vs.

UNITED STATES OF AMERICA acting through the UNITED STATES DEPARTMNET OF AGRICULTURE FOREST SERVICE,

Defendant.

Cause No. CV 25-07-H-BMM

**FINDINGS OF FACT AND CONCLUSIONS OF LAW ORDER**

## INTRODUCTION

This matter came before the Court for trial without a jury, the Honorable Brian Morris presiding, from June 29 through June 30, 2026. Plaintiff Antonio Moran ("Plaintiff") was represented by Mark M. Kovacich and Shelby B. Stover. Defendant United States of America ("Defendant") was represented by Assistant United States Attorneys Jordan W. Fitzgerald and Randy J. Tanner.

Witnesses were sworn and testified, and certain exhibits were offered and received into evidence. From the evidence presented, the Court makes the following:

# I. FINDINGS OF FACT

## A. Jurisdiction and Venue.

1. Plaintiff brought a negligence and negligence per se action pursuant to the Federal Tort Claims Act (FTCA), 28 U.S.C. § 2671, et seq. Plaintiff seeks to recover damages from the United States based upon the actions of Alec Harper ("Harper"), who acted in the course and scope of his employment with the United States Forest Service, when a truck versus motorcycle collision occurred on July 20, 2022. Plaintiff alleges that Harper operated the truck in a manner that was negligent and negligent per se during the course and scope of his employment with the United States Forest Service, thereby causing the truck versus motorcycle collision and seriously injuring Plaintiff.

2. The Court properly exercises jurisdiction over these claims pursuant to the FTCA. 28 U.S.C. § 1346(b) and 28 U.S.C. § 2671 et seq.

3. Plaintiff was a resident of the State of California and lived in Lake Forest, Orange County, California at the time this action was filed. The alleged acts and omissions that gave rise to this claim occurred in Lewis and Clark County, Montana.

4. Plaintiff submitted administrative tort claims with Defendant on or about July 12, 2024. Defendant denied Plaintiff's claims on or about October 16, 2024. Plaintiff timely filed the present action on January 31, 2025, not more than six months after having submitted his administrative claim.

**B. Plaintiff's Background.**

5. Plaintiff is 59 years old and was 55 years old at the time of the collision giving rise to this action. Plaintiff was born in Peru in 1966. Plaintiff moved to the United States to continue his higher education. Plaintiff works in IT and remains employed by his company, Professional Integrations. Plaintiff has worked for his company for over 22 years.

6. Plaintiff is married to Tina Moran. The couple has been married for 22 years and have two children.

7. Plaintiff earned $155,273.66 and $123,952.01 in 2021 and 2022 respectively before the collision.

8. Plaintiff started riding motorcycles at the age of 12. Plaintiff has ridden dirt bikes, enduro motorcycles, adventure motorcycles, and sport motorcycles. Plaintiff has his California motorcycle endorsement. Plaintiff had to complete written and driving tests to obtain his California motorcycle endorsement.

9. Plaintiff completed the first and second legs of a trip from Mexico to Canada before the collision. The collision occurred during the third and last leg of the Mexico to Canada trip.

**C. Background to the Collision.**

10. Plaintiff rode a 2019 KTM 790 Adventure motorcycle for the entirety of the Mexico to Canada trip, including the first two legs. Plaintiff was riding this 2019 KTM 790 Adventure motorcycle on the third leg of the trip when the collision occurred.

11. Plaintiff prepared his motorcycle for the ride by fitting it with specialized tires, racks, crash bars, skid plates, gear, and accessories. Plaintiff had multiple GPS devices, including a Garmin inReach and his phone, to use for maps and communication.

12. Plaintiff wore protective gear for the ride, including a helmet, boots, knee guards, pants with pads and cushions, a chest protector, elbow guards, shoulder guards, gloves, and a jacket with a back protecter. Plaintiff was wearing his protective gear at the time of the collision.

13. Plaintiff testified to the value of his motorcycle, gear, and accessories at $39,104.74. The Court finds that this testimony slightly overvalues the items. The Court finds that $30,000 provides a more reasonable value for the items.

14. Plaintiff's son Antonio Moran, Jr. ("Antonio, Jr."), Adam Swinehart ("Swinehart"), and Rolando Chocarro ("Chocarro") rode motorcycles with Plaintiff on the trip from Mexico to Canada. Plaintiff and Antonio Jr. transported their motorcycles to Idaho with a truck and trailer. Plaintiff and Antonio Jr. began the ride in Idaho and met Swinehart and Chocarro there.

15. Plaintiff and the rest of the group alternated lodging by staying either in camping tents or hotels.

16. Plaintiff and the rest of the group stayed at the Holiday Express in Butte, Montana on the night before the collision. Plaintiff testified that he had a good night's sleep before the collision.

17. Plaintiff's Garmin inReach recorded his journey and pinged his location every ten minutes.

18. Plaintiff arrived in Butte, Montana around 5:09 p.m. on July 19, 2022.

19. Plaintiff consumed no alcohol on July 19, 2022.

**D. The Collision on July 20, 2022.**

20. Plaintiff and the rest of his group discussed the difficulty of riding they would encounter on July 20, 2022. The group considered three options: red routes, blue routes, and green routes. These options range from red being the most

technical to green being the easiest routes. Plaintiff and the rest of the group rode green routes on the day of the collision.

21. Plaintiff and the rest of the group departed Butte, Montana on their motorcycles around 8:30 a.m. on the morning of the collision.

22. Plaintiff and his group rode their motorcycles on Interstate 15 until about 9:20 a.m. Plaintiff and his group exited Interstate 15 and drove onto a fire road designated as a green route.

23. Exhibit 7 reflects the entire route taken by Plaintiff and his group on July 20, 2022. Plaintiff and the group started riding their motorcycles at 8:30 a.m. and stopped riding around 4:49 p.m. on the day of the collision.

24. Plaintiff and his group ended up on Stemple Pass Road near Lincoln, Lewis and Clark County, Montana.

25. Stemple Pass Road is a dirt road located in Lincoln Ranger District of the Helena-Lewis and Clark National Forest. Stemple Pass Road is roughly 18-20 feet wide. Trial Tr. vol. II, 266:13-15. By comparison, Montana Law directs that county roads be 60 feet wide. Mont. Code Ann. § 7-14-2112. The Court finds that the narrow width of Stemple Pass Road makes it able to accommodate safely vehicles traveling in opposite directions only at greatly reduced speeds.

26. Plaintiff and his group were nearing their next location of Lincoln, Montana, where they would stop for the day. Plaintiff and his group approached a blind turn on Stemple Pass Road just before 5:00 p.m.

27. Harper operated a 2013 Chevrolet Silverado 3500 pickup truck owned by Defendant. Harper drove the truck on Stemple Pass Road in the course and scope of his employment with Defendant. Harper approached the same blind turn from the opposite direction.

28. Harper was returning to his camp near the Stemple Pass Trailhead. Harper testified that he had left the ranger station in Lincoln, Montana around 4:00 p.m. to give him an hour and a half to reach his camp. Trial Tr. vol. 2, 222:12-224:12. Harper's camp was 10 to 20 minutes down another road from the summit at Stemple Pass Road. Trial Tr. vol. 2, 231:22-232:21.

29. Harper stayed at the campsite with his United States Forest Service crew the previous night and had planned to help his crew clear a trail on July 20, 2022. Trial Tr. vol. 2, 222:3-11. Harper instead drove a sick crew member back to Lincoln, Montana in the crew's only vehicle, which also contained the crew's food. Trial Tr. vol. 2, 222:12-224:12; 232:25-233:1.

30. Harper planned to have dinner ready for the crew's return to camp around 5:30 p.m. Harper still had to drive to the summit, and then another 10 to 20 minutes down the other road to his camp to reach his crew in time.

31. The collision occurred about seven miles up Stemple Pass Road from the town of Lincoln, Montana. Based on Harper's location and the condition of Stemple Pass Road, he likely left the ranger station in Lincoln closer to 5:00 p.m. than 4:00 p.m. This later departure would have forced Harper to drive faster to reach his camp by the 5:30 return of his crew.

32. Plaintiff and his group were riding in a staggered position as they approached the collision site. Plaintiff rode point near the middle of the road, and Swinehart rode behind Plaintiff to Plaintiff's right.

33. Plaintiff saw Harper and the truck coming from the opposite direction when Plaintiff entered the blind turn. Plaintiff and Swinehart testified that the truck was drifting to the outside of Stemple Pass Road, lifting a lot of dust, and appeared slightly out of control. Trial Tr. vol. I, 44:10-17, 105:1-25, 108:1-13.

34. Swinehart testified that he recalled seeing the truck coming around the corner. Swinehart saw dust blowing behind the truck. Swinehart believed the truck was traveling at a high rate of speed. The truck startled the motorcycle riders and caused them to revert to "evasive-maneuver mode" to get out of the way. The

truck's speed, which was "definitely going fast," and all the dust caused panic among the motorcycle riders. Trial Tr. vol. I, 105:1-17; and 107:22-108:8.

35. Swinehart further testified that Plaintiff was driving in the center to center-right of Plaintiff's lane when Swinehart first saw the truck. Trial Tr. vol. II, 107:12-21.

36. As Plaintiff observed Harper and the truck drifting to Plaintiff's right, Plaintiff chose to go all the way to the edge of the shoulder on the left side of the road. Trial Tr. vol. I, 44:14-25. Plaintiff had two or three seconds to decide what evasive maneuver to undertake. Trial Tr. vol. I 45:16-18.

37. Harper and the truck overcorrected after Plaintiff had maneuvered to his left and drove all the way from Plaintiff's right to Plaintiff's far left.

38. Swinehart and Harper locked eyes in the moments before the collision. Harper acknowledged seeing Swinehart before he saw Plaintiff. Trial Tr. vol. II, 235:4-7.

39. Plaintiff and Swinehart were shocked by the collision because they believed Harper would drive safely between their two motorcycles. Trial Tr. vol. I, 106:4-107:11.

40. Antonio, Jr. and Chocarro, riding at the back of the group, did not directly see the collision.

41. Harper testified that he had driven Stemple Pass Road multiple times before the collision. Harper knew it was a gravel road and he understood that loose gravel could cause a vehicle to slide, particularly when the gravel road turns into a curve. Trial Tr. vol. II, 225:8-13; 233:12-234:25.

42. Harper was listening to a podcast with an earbud in his right ear at the time of the collision. Harper testified that before the collision his mind may have been focused on work and planning for the next day. Trial Tr. vol. II, 225:19-226:11.

43. Harper further testified that he braked the truck when he first saw Plaintiff. Trial Tr. vol. II, June 30, 2026, 227:6-10. Harper could not recall whether he maneuvered to his right after having seen Swinehart. Trial Tr. vol. II, June 30, 2026, 236:3-12.

44. The impact of the collision launched Plaintiff from his motorcycle into the forest.

45. Swinehart, Chocarro, and Antonio, Jr. found Plaintiff in a forested area about 30 feet from the road. Plaintiff had an open stomach wound from a branch sticking through his stomach when found by the three other riders.

46. The crash was violent. Plastic scattered the road. Plaintiff's belongings dislodged after they flew from his motorcycle. The force of the collision caused the truck's airbags to deploy.

47. Plaintiff was placed in an ambulance and transported to the hospital in Missoula, Montana approximately 15-20 minutes after the crash.

**E. Crash Investigation.**

48. Montana Highway Patrol ("MHP") arrived at the scene of the collision. MHP Trooper Tanner Hyyppa ("Trooper Hyyppa") investigated the collision and collision site. Trooper Hyyppa completed the Montana vehicle crash report.

49. Trooper Hyyppa had been working as a trooper for approximately one year when he investigated the collision.

50. Trooper Hyyppa took photographs of the collision scene, painted lines on the roadway, noted road evidence and vehicle crash damage. The road evidence included tire tracks (pre- and post-incident), gouge marks, and vehicle debris.

51. Trooper Hyyppa's photographs show pre-impact tire prints and post-impact tire marks from the eastbound truck that he marked with orange paint. Trooper Hyyppa marked the post-impact movement of the motorcycle in yellow paint dots.

52. Trooper Hyyppa also interviewed witnesses to the collision who were available to him when he arrived at the scene. These witnesses included Swinehart, who was riding close to Plaintiff in their formation at the time of the collision.

53. Trooper Hyyppa testified over Plaintiff's hearsay objection that another motorcyclist whom he interviewed told him that Plaintiff was tired and cutting corners at the time of the accident. Trial Tr. vol. II, 245:9–13, 247:12–248:11. Trooper Yyyppa could not identify the other motorcyclist who made this statement. *Id.*

54. The physical evidence established that the impact between the eastbound truck driven by Harper and the westbound motorcycle driven by Plaintiff occurred on the right half of the eastbound lane. This physical evidence consisted of the following items: the rest positions of Plaintiff's motorcycle, Plaintiff's motorcycle gear, Plaintiff, and the truck; the pre-impact tire prints and post-impact tire marks from the truck; debris from the impact; and the location of the impact on the truck at the right front.

55. The pre-impact tire prints indicate that the truck drove generally within the eastbound lane of Stemple Pass Road from the start of the tire prints to the rest position of the truck.

56. Conversely, Plaintiff's motorcycle appeared to be slightly left of the center of the roadway by approximately seven or eight feet at the time of impact. The Court finds that Plaintiff and Harper both drove slightly into the on-coming lane of traffic based on the narrow 18-20 foot width of Stemple Pass Road at the scene of the collision. The Court further finds that Plaintiff and Harper traveled at excessive rates of speed at the time of the collision.

57. Based on his investigation, Trooper Hyyppa cited Plaintiff for "failure to give an approaching vehicle half of the roadway" pursuant to Mont. Code. Ann. § 61-8-322. Plaintiff unsuccessfully contested this citation. The Court finds that Harper also likely failed to "give an approaching vehicle half of the roadway" based on the physical evidence presented at trial, including the narrow width of Stemple Pass Road.

58. The Court finds Trooper Hyyppa's investigation to be nominally helpful in determining fault for the collision. Trooper Hyyppa conducted minimal tasks during his investigation.

59. Trooper Hyyppa took no measurements at the scene of the collision. Trooper Hyyppa failed to measure any of the distances between areas that he marked. Trooper Hyyppa failed to make a record of who had witnessed the collision. Trooper Hyyppa spoke to a witness to the collision, but he failed to write

down that witness's name or the witness's account of the collision. Trooper Hyyppa took no witness statements despite the crash report form including a section for witness accounts. And Trooper Hyyppa failed to preserve or document any recordings from his body camera.

60. Both parties presented experts to testify regarding the circumstances that occurred immediately before the crash and each party's resulting liability. The experts based their conclusions off Trooper Hyyppa's crash scene investigation, photos of the crash, and testimony from Plaintiff, Swinehart, and Harper. The competing conclusions by these experts reflect a difference in view regarding both the speed and location of the parties leading up to the collision.

61. Plaintiff called Shawn P. Hazelton ("Hazelton") to testify as a liability expert. Hazelton worked for the MHP for 30 years and has extensive crash reconstruction experience, including ACTAR accreditation, and crash investigation experience. Hazelton authored the MHP Policy on how the agency handles crashes.

62. Hazelton reviewed the following items in preparing for his testimony: photographs from Trooper Hyyppa's MHP report, Trooper Hyyppa's crash report itself, medical records, court documents, deposition testimony, and witness information. Hazelton also spoke with Plaintiff and Swinehart about the collision

and the events leading up to it. Hazelton spoke with Tropper Hyppa regarding his investigation of the collision.

63. Hazelton testified that MHP performed minimal duties in investigating this crash. The sparse investigation surprised Hazelton because the crash resulted in serious injuries and involved a government vehicle. Hazelton opined that a traffic homicide investigator should have been called to consult, and MHP should have taken measurements of the collision scene. Trial Tr. vol. II, 182:1-183:17.

64. Hazelton further testified that MHP instructs its troopers, at a minimum, to write down the names and phone numbers of witnesses to a crash. MHP provides witness statement forms that all troopers carry in their cars. It would be typical in the investigation of a serious crash to have a witness write down what they saw. Hazelton opined that investigators should talk to witnesses and document their statements in writing, by video, or by digital recorder. Trial Tr. vol. II, 182:23-184:12.

65. Hazelton further testified that MHP's investigation included no information that would indicate anything about the location of the truck being 50 feet further west, 100 feet further west, or any distance further west from the point of impact.

66. Trooper Hyyppa agreed that he should have done more in the investigation. Trial Tr. vol. II, 252:19-21. This lack of documentation leads the Court to discount the conclusions reached in Trooper Hyyppa's accident report.

67. Hazelton further testified Swinehart's account of the collision supported Plaintiff's account. Hazelton pointed to Swinehart's testimony regarding the fact that the truck had been traveling fast, came around the corner, and started drifting toward the motorcycle riders' lane. Trial Tr. vol. II, 209:14-20.

68. Hazelton opined Plaintiff's maneuver to the far-left shoulder of Stemple Pass Road proved consistent with how a driver would react when confronted with a medium-to-severe lane encroachment. Trial Tr. vol. II, 211:2-212:11.

69. Given the time the brakes were being applied and the impact of force, Harper likely had been traveling in excess of 35 miles per hour. Trial Tr. vol. II, 199:16-20. Hazelton calculated that Harper was traveling between 44 and 58 miles per hour when the tire marks began. Trial Tr. vol. II, 199:21-203:22. Hazelton described his calculations for Harper's speed to be conservative because Hazelton did not factor deployment of the truck's airbags. Trial Transcript, June 30, 2026, 203:23-204:14.

70. Harper denies speeding before the collision. Plaintiff's testimony, Swinehart's testimony, and Hazelton's reconstruction prove consistent with Harper having approached the blind gravel curve too fast, drifting toward Plaintiff's lane, causing Plaintiff to make an emergency evasive maneuver to the left, and then moving back toward Plaintiff before impact. The Court finds Swinehart's, Plaintiff's, and Hazelton's testimony credible and concludes Harper likely traveled closer to 40 mph in the moments before the collision.

71. Plaintiff saw the truck coming toward his lane and moved to his left. Harper saw Swinehart and moved back to his right. Harper then saw Plaintiff, braked the truck, slid, and struck Plaintiff.

72. Defendant called Carla Werder ("Werder") to testify as its liability expert. Werder's analysis estimated the driver response time. The drive response time attempts to calculate the time it would have taken Harper and Plaintiff to each perceive and respond to the approaching hazard. This response could have included braking, swerving, accelerator release, or combinations of those responses.

73. Werder concluded that each driver had about one second to respond before the time of impact. Werder's time and distance analysis indicates that Plaintiff's motorcycle could have moved laterally approximately two feet, at most, in the one second before the impact occurred.

74. Werder testified that the truck had been traveling at 35 mph at the time of impact. Werder conceded that Harper likely had been speeding if the truck had been traveling at 35 mph at impact and had slowed at all before impact. Trial Tr. vol. II, 282:5-12.

75. Werder determined that Harper did not hit his brakes until after the collision. This conclusion conflicts with Harper's testimony, and the statement Harper provided to Werder. Harper recalls having braked when he saw the motorcycles. Photographic evidence of skidding by the truck before the collision further contradicts Werder's conclusion that Harper did brake before the collision.

76. The Court finds that Werder's analysis of the speed of Plaintiff's motorcycle lacks sufficient factual support to prove fully reliable.

77. Werder testified that the truck never left its lane. Werder derives this opinion from incomplete information. Trooper Hyyppa agreed no physical evidence demonstrated the truck's position 50 feet, 100 feet, or any distance farther west of the photographed tire marks. Werder based her testimony on photographs taken by Trooper Hyyppa at the scene of the collision and Google aerial photographs.

78. The Court gives reduced weight to Werder's opinions. Werder relied on the limited physical evidence generated by an incomplete MHP investigation,

corrected a material opinion from her report regarding Plaintiff's speed, corrected an opinion regarding the sight distance from the truck to Plaintiff's motorcycle, and her testimony materially conflicted with Harper, Trooper Hyppaa, and Hazelton regarding Harper's braking and the presence of tire tracks and skid marks.

79. The parties introduced conflicting evidence to Plaintiff's speed immediately before the collision. Swinehart testified that the group was traveling at approximately 40 mph in the few miles leading up the collision. Plaintiff's data from his GPS confirmed Swinehart's testimony. Plaintiff's GPS data indicated that Plaintiff had been traveling 40.74 mph less than two miles before the crash site.

80. Having reviewed testimony of Swinehart, Werder, Trooper Hyyppa, and Hazelton, the Court finds that both Plaintiff and Harper approached the blind turn at unreasonably high rates of speed on the narrow 18-20 foot width of Stemple Pass Road. The Court gives reduced weight to Harper's location before the collision. The narrow width of Stemple Pass Road makes it difficult for travelers operating a large truck like Harper's to give other travelers one-half of the roadway. The size of the truck and the narrow width of Stemple Pass Road posed a heightened risk of injury to other travelers like Plaintiff. Plaintiff's motorcycle does not create a risk of injury to the same degree as did the truck. If Harper had

been traveling slower, Harper would have been able to stop the truck or slow dramatically before the collision. The Court concludes that but for Harper's rate of travel in a large truck on a narrow road that the collision would not have occurred.

81. The Court further finds that because of Plaintiff's speed, Plaintiff failed to give Harper one-half of the roadway. Plaintiff's failure to give Harper one-half of the roadway contributed to the collision. The Court concludes that but for Plaintiff's speed and failure to give Harper one-half of the roadway, the collision would not have occurred.

**F. Plaintiff's Injuries Arising from the Collision.**

82. The ambulance transported Plaintiff to Providence St. Patrick Hospital in Missoula, Montana. Medical providers initially diagnosed Plaintiff with penetrating abdominal trauma, broken ribs, hand injuries, knee injury, and traumatic injury of the colon. The Court finds that the collision caused these injuries to Plaintiff.

83. Plaintiff underwent surgery on his stomach for urgent wound exploration and diagnostic laparoscopic procedure to assess his abdominal trauma. The medical providers also tried and failed to straighten Plaintiff's broken hand.

84. Plaintiff stayed at Providence St. Patrick Hospital in Missoula for about five days. The hospital discharged Plaintiff on July 24, 2022. Plaintiff's

discharge diagnoses included abdominal trauma, liver laceration, mallet finger of right hand, closed dislocation of metacarpophalangeal joint of left thumb, fracture of multiple ribs on right side, and injury to colon.

85. A medical flight transported Plaintiff from Missoula, Montana, to Orange County, California, on July 25, 2022, where he was admitted to Kaiser Permanente.

86. Plaintiff received wound care for his abdominal injury, including placement of a wound vac while at Kaiser Permanente.

87. Kaiser Permanente discharged Plaintiff on or about July 28, 2022, with orders for home health care for his abdominal wound and hand injuries. Plaintiff required home health care from Kaiser Permanente for nearly a month after his discharge, including a hospital bed, in home nursing care, and eventual removal of the wound vac.

88. Plaintiff continued to treat his hand injuries with Dr. Lee. Plaintiff continues to have pain and stiffness in both hands. The Court finds that the July 20, 2022, collision caused Plaintiff's hand injuries.

89. Plaintiff reported to Dr. Stefan Fornalski at Kaiser Permanente for evaluation of left knee pain and left shoulder pain on September 28, 2022.

90. Dr. Fornalski diagnosed Plaintiff with a left shoulder rotator cuff tear, left shoulder long biceps tendon tear, and left shoulder AC joint arthritis. Plaintiff continued to treat his left shoulder injury with Dr. Fornalski. Plaintiff's treatment with Dr. Fornalski for his left shoulder injury included physical therapy, a left shoulder arthroscopy on December 7, 2022, and follow-up care.

91. Dr. Fornalski testified to a reasonable degree of medical probability that the collision caused Plaintiff's left shoulder rotator-cuff tear and biceps tendon injury. The Court agrees and finds that the collision caused Plaintiff's shoulder injury and biceps tendon injury.

92. Dr. Fornalski testified that Plaintiff remains at an increased risk of recurrent tear and advanced arthritis. Some patients eventually receive a full shoulder replacement. Dr. Fornalski testified this prognosis applied to Plaintiff. The Court finds that Plaintiff remains at an increased risk of recurrent injury and development of subsequent conditions from his shoulder injuries.

93. Dr. Fornalski testified that Plaintiff had a previous left knee injury in 2017. Dr. Fornalski further testified he conservatively treated Plaintiff's earlier knee injury with bracing and therapy. Plaintiff recovered well and returned to normal activities after that injury. Plaintiff did not return for treatment on his left knee from 2017 until after the collision in 2022.

94. Plaintiff testified he did not receive any medical treatment for his left knee between 2017 and 2022 and did not have issues with his left knee from 2017 until after the collision in 2022.

95. Dr. Fornalski diagnosed Plaintiff's left knee with new injuries compared to 2017. The new injuries included a full-thickness tear along the proximal aspect of the fibular collateral ligament, scarring of the ACL, chondromalacia, fraying of the anterior horn and body of the lateral meniscus, small joint effusion, diffuse pain, and swelling.

96. Dr. Fornalski based his findings on an MRI conducted in October of 2022 and another MRI conducted in June of 2023. The Court finds that the collision caused Plaintiff's new injuries to his left knee.

97. Plaintiff continued to treat his left knee injury with Dr. Fornalski. Plaintiff's treatment with Dr. Fornalski for his left knee included physical therapy, bracing, injections, left knee arthroscopy on July 18, 2023, follow-up care, and referral to Dr. Gina Mosich for a total knee replacement consultation.

98. Plaintiff reported to Dr. Mosich for a consultation on a total knee replacement. Dr. Mosich diagnosed Plaintiff with degenerative joint disease of the left knee and recommended a total left knee replacement. Plaintiff underwent a total knee replacement on November 26, 2025.

99. Dr. Fornalski testified to a reasonable degree of medical probability that the July 20, 2022, motorcycle collision more probably than not contributed to Plaintiff's knee injuries and caused or substantially aggravated Plaintiff's post-traumatic arthritis. The Court finds that the July 20, 2022, motorcycle collision contributed to or caused Plaintiff's knee injuries and that the collision caused, or substantially aggravated, Plaintiff's post-traumatic arthritis.

100. Dr. Fornalski testified to a reasonable degree of medical probability that the collision and resulting traumatic injury contributed to Plaintiff's progression of his knee arthritis and need for a total knee replacement. The Court finds that the July 20, 2022, collision contributed to the progression of Plaintiff's knee arthritis and to his need for a total knee replacement.

101. Plaintiff continues to suffer pain, swelling, and functional limitations related to his knee. Dr. Fornalski testified that Plaintiff reasonably will require long-term follow up care, extensive physical therapy, and medication management for his knee condition. The Court finds that Plaintiff will require future medical care for his knee injuries that were caused by or substantially aggravated by the collision.

102. Plaintiff also underwent treatment for the scar on his abdomen. The treatment has included keloid treatment with Dr. Hege Grande Sarpa at Kaiser

Permanente, surgery in Peru, and laser treatment with Dr. Christopher Zachary at UCI Health. Plaintiff continues to undergo treatment for his abdominal scarring. The Court finds that the collision caused Plaintiff's abdominal scar and that Plaintiff's ongoing care for his scar is reasonable and related to the collision.

**G. Plaintiff's Damages.**

103. The Court finds that Plaintiff's collision-related medical expenses reasonably total $140,000, including the amounts in Exhibit 3 and Plaintiff's scar revision treatment in Peru. Ex. 3. The Court finds these medical expenses were caused by the collision and were reasonably necessary.

104. Plaintiff presented the testimony of Certified Life Care Planner, Rae Lynn Christians ("Christians"), regarding Plaintiff's future medical expenses. Christians prepared a Life Care Plan and Life Care Plan Addendum in Plaintiff's case. Christians testified that Plaintiff's reasonable future medical expenses total $376,701.97 to $398,328.99. Trial Tr. vol. I, 158:14-18; Ex. 22 at 25 (demonstrative).

105. Christians offered her opinion to a reasonable degree of professional certainty. The opinion offered by Christians derives from her education and experience as a registered nurse and certified life care planner, her review of

Plaintiff's medical records, and discussion with Plaintiff. The Court finds Christians's methodology to be accepted in the field of life care planning.

106. Defendant presented the testimony of Cloie Johnson and Dr. Daniel Gibbs in support of its damages case. Johnson, in coordination with Dr. Gibbs, evaluated the Life Care Plan proposed by Christians.

107. Dr. Gibbs has no treating relationship with Plaintiff, he has never examined Plaintiff, he has never spoken to Plaintiff, and he has never spoken with any of Plaintiff's treating providers. Dr. Gibbs issued his findings on the causation and apportionment of Plaintiff's knee injury without having reviewed the medical record created by Plaintiff's treating provider, Dr. Mosich. Trial Tr. vol. II, 317:3-318:8.

108. Dr. Gibbs conceded Plaintiff had no left knee-related doctor visits from September 2017 until the collision. Dr. Gibbs further conceded that the collision caused Plaintiff's hand injuries and shoulder injury. Dr. Gibbs stated Plaintiff needs no further treatment, despite having no records or information indicating Plaintiff's injuries were asymptomatic.

109. Johnson did not opine independently on any of the items in her rebuttal life care plan and relied on Dr. Gibbs's opinions. Johnson determined no additional treatment was medically necessary based on Dr. Gibbs's findings of no

further medical treatment needed. The Court finds the testimony of Dr. Gibbs and Johnson persuasive only to a limited degree based on the issues discussed above.

110. Pursuant to the testimony of Plaintiff and Dr. Fornalski, the Court further finds that the July 20, 2022, collision caused Plaintiff's hand injuries and shoulder injury. The Court finds Dr. Gibbs's testimony relating to Plaintiff's future medical treatment as less credible due to the limited scope of information that Dr. Gibbs reviewed. The Court, by contrast, finds credible Christians's analysis of Plaintiff's future medical expenses based on the evidence and testimony presented at trial.

111. Defendant presented testimony of Sean Black, CPA. Black testified that $306,800 to $324,300 represents a reasonable present-value range for Plaintiff's future medical expenses that Christians found in her report. The Court finds that $310,000 represents a reasonable present-value range for Plaintiff's future medical expenses based on Black's testimony.

112. Plaintiff suffered loss of wages because he could not work for a period after the collision. Plaintiff testified that his W-2s show that he earned $155,273.66 in 2021 and $123,952.01 in 2022, the year of the collision.

113. Black testified that Plaintiff's wage-loss varied from $8,125.00 to $31,322.00. Black agreed that $31,322.00 represents the reasonable top end of the

wage-loss range based on Plaintiff's W-2s. The Court finds Plaintiff reasonably suffered wage loss of $30,000.00.

114. Plaintiff alleges pain and suffering and loss of established course and way of life. Plaintiff, Plaintiff's wife, and Antiono Jr. all testified to Plaintiff's pain and suffering and loss of established course and way of life. Plaintiff has lost much of his motorcycle riding hobby. Plaintiff's injuries have forced him to miss out on important family events. Plaintiff no longer can jog and walking causes pain to Plaintiff. The injuries have put stress on Plaintiff's marriage and put Plaintiff in a position of being forced to sell his family home.

115. The Court finds that Plaintiff incurred significant damages for pain and suffering and loss of established course and way of life from the injuries sustained in the collision. The Court finds that Plaintiff reasonably has sustained pain and suffering and loss of established course and way of life in the amount of $330,000.00.

## II. CONCLUSIONS OF LAW

### A. Jurisdiction and Venue.

1. Plaintiff properly exhausted his administrative remedies under the FTCA by submitting an administrative tort claim on July 12, 2024, to Defendant. Defendant denied Plaintiff's administrative claim in writing on October 16, 2024.

Plaintiff filed his Complaint in this Court on January 31, 2025. The Court possesses subject matter jurisdiction of Plaintiff's claim pursuant to 28 U.S.C. § 1346(b)(1).

2. Venue is proper in the District of Montana because the events giving rise to this action occurred in the State of Montana. 28 U.S.C. § 1402(b). Venue is appropriate in the Helena Division pursuant to L.R. 1.2(c)(3) and 3.2(b)(1)(A)-(B), because the events giving rise to this action occurred in Lewis and Clark County.

**B. Applicable Law.**

3. The burden of proof in a civil action remains the same regardless of whether the finder of fact is a judge in a bench trial or a jury. *Prickett v. U.S.*, 111 F. Supp. 2d 1191, 1192 (D. Ala. 2000) (citing *Cabrera v. Jakabovitz*, 24 F.3d 372, 380 (2d Cir. 1994)). A plaintiff bears the burden of satisfying the finder of fact that they have proven every element of their claim by the preponderance of the evidence. *In re Cain Walnut Shelling*, 175 F.4th 1069, 1076 (9th Cir. 2026). Preponderance of the evidence means such evidence, when considered with that opposed to it, has more convincing force and demonstrates that what is sought to be proved is more likely than not true.

4. Defendant stands liable under the FTCA for torts committed by its agencies and employees in the same manner and to the same extent as a private

individual under like circumstances, in accordance with the law of the place where the act or omission occurred. 28 U.S.C. § 2674. Applicable state law must be the source of the claim for relief. *Trobetta v. United States*, 613 F. Supp. 169 (D. Mont. 1985). Accordingly, Montana negligence law applies here because Plaintiff's injuries and the claims giving rise to those injuries occurred in the State of Montana.

5. Montana law requires proof of four essential elements for a negligence claim: (1) duty; (2) breach of duty; (3) causation; and (4) damages. *Wiley v. City of Glendive*, 900 P.2d 310, 312 (Mont. 1995).

6. A plaintiff must prove five elements to establish negligence per se under Montana law: (1) the defendant violated a particular statute; (2) the statute was enacted to protect a specific class of persons; (3) the plaintiff is a member of that class; (4) the plaintiff's injuries are the sort the statute was enacted to prevent; and (5) the statute was intended to regulate a member of defendant's class. *Mid Continent Cas. Co.*, 337 F. Supp. 3d at 941 (citing *Edie v. Gray*, 121 P.3d 516, 520 (Mont. 2005)).

*7.* "One key distinction between negligence per se and ordinary negligence is that once a violation of a statute is proven, and the [five standards above] are met, a defendant is negligent, as a matter of law." *Mid Continent Cas.*

*Co.,* 337 F. Supp. 3d at 941 (quoting *Schwabe ex rel. Est. of Schwabe v. Custer's Inn Assocs., LLP*, 15 P.3d 903, 908 (Mont. 2000), overruled in part on other grounds by *Giambra v. Kelsey*, 162 P.3d 134 (Mont. 2007)).

8. “The effect of . . . negligence per se is to stamp the defendant’s conduct as negligence, with all of the effects of common law negligence, but with no greater effect.” *Giambra*, 162 P.3d at 144. “Liability does not become fixed upon a showing of negligence per se, however; there must also be a ‘determination of whether the violation was the proximate cause of the alleged injuries.’” *Mid Continent Cas. Co.*, 337 F. Supp. 3d at 941 (quoting *Giambra*, 162 P.3d at 144).

9. The Court first will address the common law duties and related motor vehicle statutes at issue in this case, followed by a determination of whether Harper breached those duties and violated the relevant statutes.

**C. Common Law Duties and Statutory Obligations.**

10. “The existence of a legal duty and the scope of any duty are questions of law.” *Fabich v. PPL Montana, LLC*, 170 P.3d 943, 947 (Mont. 2007). In Montana, a common law duty may arise from a statutorily imposed obligation. *Mid Continent Cas. Co.*, 337 F. Supp. 3d at 946 (citing *Fisher*, 181 P.3d at 606-07).

11. Common law negligence establishes that every person, at the most basic level, shares the duty to exercise the level of care that a reasonable and

prudent person would under the same circumstances. Montana law further imposes specific duties of care for motor vehicle operators. *Creel v. Loy*, 524 F. Supp. 3d 1090, 1097 (D. Mont. 2021) (citation omitted).

12. Montana statutes impose a duty on every motorist to operate a vehicle in a "careful and prudent manner" in a way that "does not unduly or unreasonably endanger the life, limb, property or other rights" of another and at a speed no greater than is reasonable under the circumstances. *Fahrnow v. E-5 Oilfield Servs.*, 577 P.3d 1107, 1112 (Mont. 2025) (citing Mont. Code Ann. §§ 61-8-302(1), -303(3)). Subject to certain exceptions, drivers in Montana also have a duty to drive on the right side of the roadway. *Id.* (citing Mont. Code Ann. § 61-8-321); *Craig v. Schell*, 975 P.2d 820, 823 (Mont. 1999).

13. The Court concludes that Harper, while acting in the course and scope of his employment with Defendant, owed other motorists, including Plaintiff, duties derived from Montana's motor vehicle laws. These duties included the following requirements: to drive "in a careful and prudent manner that does not unduly or unreasonably endanger the life, limb, property, or other rights" of others on the roadway (Mont. Code Ann. § 61-8-302(1)); to operate his vehicle in a "careful and prudent manner and at a reduced rate of speed no greater than is

reasonable and prudent under the conditions;" (*id.* at § 61- 8-303(3)); and to drive on the "right half of the roadway," absent specified exceptions. *Id.* at § 61-8-321.

14. Harper breached these duties when he traveled on Stemple Pass Road at a speed close to 40 mph on a narrow road in a large truck as he approached the collision site. The speed and size of Harper's truck at the point of the collision made it impossible for him to comply with his duties under Montana law to operate the truck in a safe and prudent manner that did not endanger the safety of other motorists.

**D. Defendant's Breach of the Duty of Care.**

15. Plaintiff must next prove the element of breach for his common law negligence claim. *See Mid Continent Cas. Co.*, 337 F. Supp. 3d at 945-46 (citation omitted). "Whether a defendant breached a legal duty owed to the plaintiff is a question of fact that the factfinder must determine." *Est. of Mabee*, 579 P.3d at 528 (citing *Bonilla v. U. of Montana*, 116 P.3d 823, 826 (Mont. 2005)).

16. "The violation of a statute is prima facie evidence of a breach of that statutory duty under Montana law." *Fisher*, 181 P.3d at 609 (citation omitted). Plaintiff also must prove a statutory violation as an essential element of negligence per se. *See Mid Continent Cas. Co.*, 337 F. Supp. 3d at 941 (citation omitted).

17. As such, this Court must determine whether Harper violated Mont. Code Ann. §§ 61-8-302(1), 61-8-303(3), and 61-8-321 relating to the collision with Plaintiff on Stemple Pass Road.

18. The Court determines that Harper breached his duty of reasonable care by failing to operate the truck at a speed and in a manner that was reasonably safe for a blind curve on a loose gravel road in light of the 18-20 foot width of Stemple Pass Road at the scene of the collision. These factors made it impossible for Harper to comply with the requirements of Mont. Code Ann. § 61-8-322 of giving a driver in the other in the other direction "at least one-half of the main-traveled portion" of the narrow roadway.

19. The combination of Harper's speeding on a narrow road and the size of the truck "unreasonably endanger[d] the life, limb, property, or other rights" of others on the roadway. Mont. Code Ann. §§ 61-8-302(1). Harper further breached the duty of care to operate his vehicle in a "careful and prudent manner and at a reduced rate of speed no greater than is reasonable and prudent under the conditions. Mont. Code Ann. 61-8-303(3). Finally, Harper breached his duty of care by failing to drive on the "right half of the roadway." *Id.* at § 61-8-321.

## III. Comparative Negligence

20. Defendants' liability may be reduced or altogether negated if and to the extent Plaintiff's own negligence caused his injuries. Mont. Code Ann. § 27-1-702; *Payne v. Knutson*, 99 P.3d 200, 203 (Mont. 2004).

21. Pursuant to Mont. Code Ann. § 27-1-702, "a plaintiff's contributory negligence is a defense to a charge of negligence." "Contributory fault does not bar recovery in an action by a person or a person's legal representative to recover tort damages for death of a person or injury to a person or property if the contributory fault was not greater than the fault of the defendant or the combined fault of all defendants and nonparties, but damages allowed must be diminished in proportion to the percentage of fault attributable to the person recovering." Mont. Code Ann. § 27-1-702.

22. Comparative negligence "compares the conduct of the parties 'based on evidence and contributory negligence, as established by reasonable and prudent person standards.'" *Giambra*, 162 P.3d at 144 (citations omitted).

23. "A plaintiff is contributorily negligent when they fail to exercise reasonable care for their own safety and their failure contributes to causing their injury." *Shahood v. City and Cnty. of Butte-Silver Bow*, 581 P.3d 1, 12 (Mont. 2025) (citing *Giambra*, 162 P.3d at 143-44); *see also Olson v. Shumaker Trucking and Excavating Contractors, Inc.*, 196 P.3d 1265, 1275 (Mont. 2008).

24. A plaintiff may not recover under Montana's comparative negligence scheme if the fact finder finds the plaintiff more than fifty percent negligent. *Est. of Mabee*, 579 P.3d at 526-27 (citing Mont. Code Ann. § 27-1-702); *see also Smith v. BNSF Ry. Co.*, No. CV 23-82-GF-BMM, 2025 WL 2884623, at *1 (D. Mont. 21 Oct. 9, 2025). "Even if the fact finder finds the plaintiff less than fifty percent negligent, the plaintiff may not recover damages for the percentage of fault attributed to them." *Id.* at 527 (citing Mont. Code Ann. § 27-1-702). "This standard encompasses the principle that *every person has a duty to exercise ordinary care for their own safety*." *Id.* (emphasis added).

25. Montana's comparative negligence laws require "the fact-finder to consider the negligence of the claimant, injured person, defendants, and third-party defendants, even if a party proceeds under a claim of negligence per se or if the factfinder determines that one or more persons was negligent per se." *Giambra*, 162 P.3d at 145. Consequently, "a claim of negligence per se or a determination that a person was negligent per se does not preclude the defense of contributory negligence or bar the apportionment of negligence liability based on a comparative negligence scheme." *Id.*

26. Under such an analysis, the factfinder "must consider evidence of negligence from violation of a highway traffic statute, which was a proximate

cause of the accident, with other evidence of negligence on the part of both parties" and it "must then weigh or compare the negligence of both parties in reaching its verdict." *Reed v. Little*, 680 P.2d 937, 941 (Mont. 1984); *see also Tonner v. Cirian*, 291 P.3d 1182, 1187 (Mont. 2012). In doing so, either party's negligence may be evidenced by violation of a traffic statute. *Reed*, 680 P.2d at 940.

27. Plaintiff drove in the wrong lane of travel entering the blind curve. Plaintiff reacted to Harper and swerved to his left. This prohibition against traveling in the wrong lane applies to all roads of sufficient width. Mont. Code Ann. § 61-8-321.

28. The Court qualifies Defendant's argument that Plaintiff's presence on the wrong side of the road before the collision constitutes prima facia evidence of negligence. Defendant cites *Lyndes v. Scofield*, 589 P.2d 1000, 1004 (Mont. 1979), for support that Plaintiff's conduct constitutes prima facia evidence of negligence. The offending driver in *Lyndes* traveled on a paved city street in Missoula, Montana presumably in compliance with Montana's 60-foot width regulation for roads. Mont. Code Ann. § 7-14-2112. The driver crossed onto the other lane of traffic after striking a "chuckhole" in her lane. The 18-20 foot width of Stemple Pass Road at the scene of the collision made it impossible for either Plaintiff or

Harper to comply fully with Mont. Code Ann. 61-8-321. The Court gives reduced weight to the analysis and conclusion in *Lyndes* based on the factual differences.

29. Plaintiff drove across the center of the narrow road at the time of the collision. Harper also drove across the center of the narrow road at the time of the collision. Plaintiff drove a motorcycle while Harper drove the large truck.

30. Plaintiff's speed made it exceedingly difficult for Plaintiff to give Harper half of the narrow road as required under Mont. Code. Ann. § 61-8-322.

31. Plaintiff's negligence contributed to his injuries by traveling too fast for the conditions of the road and failing to give Harper half of 18-20 foot wide Stemple Pass Road at location of the collision.

32. The Court concludes that Plaintiff's negligence and negligence per se constitute 40 percent of the fault for the collision. Accordingly, the Court further concludes that Harper's negligence and negligence per se constitute 60 percent of fault for the collision.

## IV. Causation

33. The Court looks to the issue of on the part of both Harper and Plaintiff to provide a full determination of the merits in this matter.

34. "[T]he causation element of a negligence claim requires affirmative proof that the alleged negligent conduct (i.e., alleged breach of a legal duty) was a

cause-in-fact (i.e., factual cause) of the alleged harm and resulting damages." *Kipfinger v. Great Falls Obstetrical & Gynecological Assocs.*, 525 P.3d 1183, 1196 (Mont. 2023) (citations omitted); *see also Creel*, 524 F. Supp. 3d at 1098-99.

35. The collision or Plaintiff's resulting injuries would not have occurred but for Harper's speed and his inattentive driving. Harper would have had more time to respond to Plaintiff and his group of motorcycle riders if Harper had approached the curve at a slower speed and been more attentive. A slower approach speed by Harper would have reduced the likelihood of Harper's overcorrection and the ensuing collision.

36. The collision or Plaintiff's resulting injuries would not have occurred but for Plaintiff's speed and failure to give Harper half of the narrow road. Plaintiff would have had more time to respond to Harper if Plaintiff had approached the curve at a slower speed and given Harper half of the 18-20 foot wide Stemple Pass Road at location of the collision.

## V. Damages

37. The Court concludes that Harper's negligence, while acting within his course and scope of employment with Defendant, resulted in damages to Plaintiff. The amount of these damages must be offset by 40 percent to represent Plaintiff's share of the fault for having caused the collision.

38. The Court has found that the evidence in this case supports an award of damages to Plaintiff for his past medical expenses. The Court concludes that an award of $140,000.00 would compensate Plaintiff for his past medical expenses.

39. The Court has found Christians to be a respected and credible life care planner who is qualified to testify as to recommendations for Plaintiff's future medical care. The Court concludes that the evidence in this case supports Christians's opinion that Plaintiff will require future medical care and life care.

40. The Court concludes an award of $310,000.00 would compensate Plaintiff for his future medical expenses.

41. The Court has found that the evidence in this case supports an award for the value of Plaintiff's wage loss. The Court concludes that an award of $30,000.00 would compensate Plaintiff for his wage loss.

42. Plaintiff's testimony that he has suffered property damage loss stands unrebutted. Plaintiff's testimony regarding his property damage is credible. The Court concludes that an award of $30,000.00 would compensate Plaintiff for his property damage.

43. The Court has found that the evidence supports an award to Plaintiff for his future medical expenses. The Court concludes that an award of $310,000.00 would compensate Plaintiff for his future medical expenses.

44. The Court has found that the evidence supports an award for Plaintiff's pain and suffering and loss of established course and way of life. The Court concludes that an award of $330,000.00 would compensate Plaintiff for his pain and suffering and loss of established course and way of life.

**ORDER**

Accordingly, **IT IS HEREBY ORDERED**, pursuant to Fed. R. Civ. P. 58, that the Clerk of Court enter judgment by separate document in favor of Plaintiff and against Defendant as follows:

1. Plaintiff is due a reasonable award for his past medical expenses of $140,000.00;

2. Plaintiff is due a reasonable award for his future medical expenses in the amount of $310,000.00;

3. Plaintiff is due a reasonable award for his wage loss in the amount of $30,000.00;

4. Plaintiff is due a reasonable award for his property damages in the amount of $30,000.00;

5. Plaintiff is due a reasonable award for his pain and suffering and loss of established course and way of life in the amount of $330,000.00.

6. In sum, Plaintiff is due a reasonable award of $840,000.00 for his total damages.

7. The Court must reduce this amount by 40 percent to recognize Plaintiff's share of the fault in causing the collision. This 40 percent reduction to reflect Plaintiff's share of the fault results in a total award of $504,000.00 to Plaintiff.

**IT IS FURTHER ORDERED** that Plaintiff is authorized to recover such costs as are authorized by law.

**IT IS FURTHER ORDERED that** the Clerk of Court shall notify the parties of the making of this Order.

DATED this 2nd day of October 2026.

Brian Morris, Chief District Judge
United States District Court